UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DICK LALOWSKI,

    Plaintiff,

        v.

CITY OF DES PLAINES, et al.

    Defendants.

No. 08 C 3780
Judge James B. Zagel

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff filed his five count complaint alleging First Amendment retaliation and facially challenging several City of Des Plaines Police Department Rules and Regulations as overly broad under the First Amendment. Before the court are Defendants' motion for summary judgment and Plaintiff's motion for partial summary judgment. For the following reasons, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion for partial summary judgment is DENIED.

I.    **BACKGROUND**

Plaintiff is a former police officer for the City of Des Plaines Police Department and Chapter President of the Metropolitan Alliance of Police, Chapter #240 ("the Union"), which represented fellow Des Plaines officers. He began working for Des Plaines in 1994 and was terminated on May 30, 2008.

In the early morning hours of May 20, 2006, several individuals gathered for a protest outside of the American Women's Medical Center, an abortion clinic located at 110 South River Road in Des Plaines, Illinois. The protesters planned to hold prayer vigils throughout the day,

hand out baskets filled with gifts for newborns, and display images of aborted fetuses as part of an attempt to dissuade women from entering the clinic.

<u>The On-Duty Encounter</u>

Sometime around 6:30 am, Plaintiff, on duty and in uniform, drove by the clinic, noticed the protesters, and decided to make contact with them to "inform the [protesters] . . . to abide by the laws of the City of Des Plaines." (Lalowski Dep. 26). Plaintiff pulled his marked police vehicle up to the demonstrators and, while remaining inside his vehicle, began speaking to demonstrator Paula Emmerth. Plaintiff told Emmerth not to impede traffic or to stop anyone from entering the clinic. He told Emmerth and other protesters that he would arrest them if they did not comply.

At this point, the stories diverge. Emmerth claims Plaintiff then called her a "fat fucking cow." (P. Emmerth Dep. 64). She and other demonstrators allege Plaintiff used repeated profanities and threats ("I'll fucking arrest you"), accused the demonstrators of acting like the Taliban, and generally behaved in a way that was intimidating and "out of control." *Id*. Plaintiff, on the other hand, described this initial confrontation with the demonstrators as "adversarial" but denies using profanity or accusing the demonstrators of acting like the Taliban. (Lalowski Dep. 52).

It is not clear exactly how long this first encounter lasted but Plaintiff appears to have made it back to the Des Plaines police station by approximately 6:45 am, where he changed clothes and returned his equipment. While changing in the locker room, Plaintiff began to think about the images of aborted fetuses the demonstrators were displaying and became upset. He testified in his deposition, "[a]t that time I was thinking about why would somebody put those

2

signs out there, why would anybody who was trying to help people do that [?] I had to know."

(Lalowski Dep. 57). Plaintiff decided he would go back to the clinic to confront the

demonstrators about their signs.

    <u>The Off-Duty Encounter</u>

At approximately 7:15 am, Plaintiff, now off duty and wearing plainclothes, returned to

the abortion clinic in his personal vehicle. He parked his car in an adjacent lot and walked over

to Officer Matthew Jones, a fellow Des Plaines police officer, who was sitting in an unmarked

vehicle in the clinic parking lot. Officer Jones was working "extra duty" that day at the abortion

clinic to provide security and ensure the protest remained orderly. Plaintiff greeted Officer Jones

and they had a brief conversation about a motorcycle Plaintiff was interested in purchasing from

him. Officer Jones then asked Plaintiff why he had come to the clinic, and Plaintiff said the he

wanted to speak to the protestors about their signs. Officer Jones told Plaintiff that he "did not

want any drama" but did not press Plaintiff any further on the matter. Plaintiff then left Officer

Jones to make contact with Paula Emerth.

Plaintiff approached Emmerth, greeted her, and asked if she remembered him. Emmerth

said that she remembered him as the police officer who had spoken to her earlier that morning.

Plaintiff told her that he was now off duty and "not here representing anybody." (Lalowski Dep.

68). He then asked Emmerth "why she had to show those signs." (Lalowski Dep. 69). Emmerth

responded that they were using the signs to tell the truth about abortion. Plaintiff responded by

stating, "Okay. Let's talk about the truth then. You're fat." (Defendants' Statement of Facts, ¶

19). Plaintiff also called her "fatty" in a loud voice in an effort to get her attention. *Id.*

3

Plaintiff then started telling Emmerth and other demonstrators who had gathered that they should not show the fetus signs because "the truth sometimes hurts." He stated that a woman who had recently had a miscarriage might drive by and be very upset by the signs. When Emmerth refused to take down the signs Plaintiff called her a "fat fucking cow" and a "sinner of gluttony". (Lalowski Dep. 71; PSOF 25). Plaintiff says he made these statements as a stinging example to Emmerth of how the truth can hurt. Plaintiff then began to lecture Emmerth on the importance of exercise and got down on all fours to demonstrate aerobic exercises she could do to lose weight.

After demonstrating the exercises, Plaintiff got up and continued talking to Emmerth. At some point, he reached out and made physical contact with her. There is a factual disagreement over the manner of the touching. Plaintiff says he patted Emmerth on the shoulder to "convey sincerity." (Lalowski Dep. 81). Emmerth says that Plaintiff "poked" her in both her arms and rubbed her arms "in a creepy, sexual way." (P. Emmerth Dep. 91).

Plaintiff remained at the demonstration for approximately one hour and twenty minutes. During the course of this time he spoke with many demonstrators. There are factual disputes over Plaintiff's specific language, tone of voice, and general demeanor during these conversations. The following facts about the off-duty encounter are not disputed:

a.      Plaintiff accused the demonstrators of acting like terrorists and the Taliban.

b.      Plaintiff spoke about pedophiles and compared the aborted fetus sign to an image of a Catholic priest bending over a small boy.

c.      Plaintiff called demonstrator Wanda Glitz a "psycho" and a "man hater."

4

d.  Plaintiff called Paula Emmerth a "fat fucking cow" several more times and also called her sister Teresa Emmerth "fatty."

e.  Plaintiff told Paula Emmerth she would be a beautiful woman if she was not so fat.

f.  Plaintiff asked Paula Emmerth in a sarcastic tone of voice whether she was hiding food somewhere.

g.  Plaintiff hugged Paula Emmerth and said that he loved her.

h.  Two demonstrators called 911 to request police assistance in dealing with Plaintiff.

i.  While at the clinic, Plaintiff knew the demonstrators were calling the police about him.

At approximately 9 am, Plaintiff left the clinic and drove home. He made no report of his on duty or off duty contact with the protesters.

<u>Investigation, Disciplinary Proceedings, and Discharge</u>

Later that day, Defendant James Prandini, Chief of Police for the City of Des Plaines, received a call at home from one of his sergeants notifying him of the morning's incidents. Prandini asked two officers, Sergeant Kevin O'Connell and Deputy Chief Terry McAllister, to investigate Plaintiff's conduct at the abortion clinic. During the course of the investigation Plaintiff and several demonstrators were interviewed and gave written statements. On May 24, 2006, Sergeant O'Connell and Deputy Chief McAllister sent Prandini a final report of their investigation. The report stated in part, "Officer Lalowski's conduct [on the morning of May 20th] toward the public was harsh, profane, and unruly and caused a huge disturbance among

numerous citizens of the city of Des Plaines.  He used insulting, profane language toward

numerous female citizens and caused a hostile feeling towards the city of Des Plaines and the

Des Plaines Police Department."

Based on the investigation report, Defendant Prandini decided to suspend Plaintiff

without pay and file charges with the Board of Fire & Police Commissioners for the City of Des

Plaines ("the Board") seeking Plaintiff's termination.  Prandini filed five charges against Plaintiff

for violations of the following Des Plaines Department Rules and Regulations:

1. Rule 310.02: Unbecoming Conduct - A member or employee shall conduct himself at all times, both on and off duty, in such a manner so as to reflect most favorably on the Department.  Conduct unbecoming a member or employee shall include that which tends to bring the Department into disrepute or reflects discredit upon the individual member or employee as a member or employee of the Department, or the member or employee.

2. Rule 380.54: Members and employees shall be courteous and orderly in their dealings with the public.  They shall perform their duties quietly, avoid harsh, violent, profane or insolent language and shall always attempt to remain calm, regardless of provocation to do otherwise.

3. Rule 310.34: Members and employees shall observe and obey all laws and ordinances all rules and regulations of the Department and all official written directives of the Department or Division thereof.

4. Rule 390.40: Members and employees are required to be truthful at all times whether under oath or not.

5. Rule 380.60: All members, while charged with vigorous and unrelenting enforcement of the law must remain completely impartial toward all persons coming to the attention of the Department.  Violations of the law are against the people of the State and not against the individual officer.  All citizens are guaranteed equal protection under the law.  Exhibiting partiality for or against a person because of race, creed or influence is unprofessional conduct.  Similarly, unwarranted interference in the private business of others when not in the interests of justice is unprofessional conduct.

Two additional charges were brought against Plaintiff based on violations of Illinois Criminal Code Sections 5/12-1 and 5/12-3 –assault and battery, respectively.

Between April 13 and October 22, 2007, the Board held seven days of hearings on the charges.[1]  At the proceedings, both sides were represented by counsel, several witnesses testified, and Plaintiff was given a full opportunity to confront adverse witnesses and present his own case. On June 19, 2007, the Board unanimously voted to sustain all charges against Plaintiff.  On December 3, 2007, the Board unanimously voted to order Plaintiff discharged from the Des Plaines Police Department.  The Board issued a written opinion containing its legal conclusions and factual findings.

On July 2, 2008, Plaintiff filed the instant lawsuit against the City of Des Plaines, the Board, and Chief Prandini.  Plaintiff alleges that his firing constituted unlawful retaliation for engaging in protest speech at the abortion clinic and for his leadership role in the Union. Plaintiff also challenges City of Des Plaines Department Rules 310.02, 380.54, 310.34 and 390.50 as overly broad under the First Amendment and Article I §§ 4 and 5 of the Illinois Constitution.  Finally, Plaintiff asks this court to review Board's administrative decision terminating Plaintiff's employment with the Des Plaines Police Department.

## II. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[1]The hearings were bifurcated into a guilt phase, which consisted of four hearings on April 13, April 16, April 20 and May 22, 2007, and a penalty phase, which consisted of three hearings on September 5, October 2, and October 22, 2007.

matter of law." Fed. R. Civ. P. 56(c). The facts presented are to be construed in a light most

favorable to the nonmoving party. *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the

nonmoving party who must go beyond mere allegations and offer specific facts showing that

there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477

U.S. 317, 323-324 (1986).[2]

## III. DISCUSSION

### A.    Counts I and II: First Amendment Retaliation

When the government acts as an employer it may regulate speech more broadly than

when it acts as sovereign. *See generally Pickering v. Board of Ed. Of Township High School*

*Dist. 205, Will Cty.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983). The

employer-employee relationship raises functional considerations not present in the sovereign-

citizen relationship; in order to operate effectively the government must be given some latitude to

proscribe employee expression that is particularly damaging to its mission. So while public

employees do not relinquish all First Amendment protections, they may be subject to restraints

on speech that would be unconstitutional if applied to the general public. *San Diego v. Roe*, 543

U.S. 77, 80 (2004),

In determining the degree to which the government may regulate the speech of its

employees courts must "balance the interests of the [employee], as a citizen, in commenting upon

matters of public concern and the interest of the State, as an employer, in promoting the

---

[2]There are many factual disputes over what Plaintiff said and did on the morning of May 20, 2006. Those disputes would belong to a jury to sort through. My analysis is based on the facts that Plaintiff has admitted to be true.

efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Before balancing interests, however, a threshold inquiry must be made as to whether the speech

in question addresses a matter of public concern. Speech that addresses a matter of public

concern is any speech "fairly considered as relating to any matter of political, social, or other

concern to the community." *Connick*, 461 U.S. at 146. "Whether an employee's speech

addresses a matter of public concern must be determined by the content, form, and context of a

given statement, as revealed by the whole record." *Id*. at 147-48. Dismissals from government

service based on speech unrelated to matters of public concern are generally not reviewable on

First Amendment grounds. *Id*. at 146-147.

 If a plaintiff can show that his expression relates to a matter of public concern, the burden

shifts to the government to prove that the employee's speech interest is outweighed by the

interest of the state, as employer, in promoting effective and efficient public service. "The

stronger the employee's interest in speaking, the more substantial a showing the state must make

to justify its restriction of that speech." *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). If

the government can show that its own legitimate interests outweigh the employee's speech

interests, the speech is unprotected and may serve as the basis for adverse employment action. If

the government cannot make this showing, the speech is protected and may not serve as a basis

for adverse employment action.

 To make out a prima facie case that the government has made an adverse employment

decision in response to protected speech (First Amendment retaliation), a public employee must

present evidence that: (1) his speech was constitutionally protected under the *Connick-Pickering*

balancing test; (2) the speech was a substantial or motivating factor in the alleged retaliatory

action; and (3) if the plaintiff satisfies the first two steps, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech. *Hutchins v. Clarke*, 661 F.3d 947, 955 (7th Cir. 2011).

The elaborate framework laid out above is the product of the Supreme Court's long struggle to safeguard our nation's cherished speech rights for public servants, while preserving the government's ability to effectively operate as an employer. Public employee speech cases can raise the most challenging of First Amendment questions, exposing fundamental tensions between freedom of expression and social order that lie at the core of our democracy. This is not one of those cases.

Plaintiff argues that all of his speech and actions on the morning of May 20, 2006, addressed matters of public concern because they occurred within the general context of an abortion protest. But the specific context of Plaintiff's remarks, as well as the content and form, reveal that most of his expression that morning strayed far from the obvious issues of public concern raised by his surroundings to unrelated utterance of insults, banter and vulgarity. *See Berg v. Hunter*, 854 F.2d 238, 243 (7th Cir. 1988) ("[C]ontent is the single greatest factor in the *Connick* inquiry.").

It is helpful to think of Plaintiff's speech as falling into three categories. First, speech that addressed matters of public concern which the government did not have a legitimate overriding interest in proscribing (protected). Second, speech that loosely touched upon matters of public concern which the government had a strong overriding interest in proscribing (unprotected). And third, speech that did not touch upon matters of public concern (unprotected). I analyze each category in detail below.

*Protected Speech*

10

There is no doubt that Plaintiff engaged in *some* protected speech outside the abortion clinic. He had a right to object to the demonstrators' methods and voice his strong disapproval of the fetus signs. His statement that a mother who had recently had a miscarriage could be deeply offended by the image was well within the bounds of First Amendment protection. His suggestion to the demonstrators that they may be more effective by focusing their efforts on electing sympathetic political candidates was quintessential protected political speech. Even his comparisons to the Taliban and acts of pedophilia by Catholic priests, while provocative, were probably protected. But Plaintiff has a causation problem–there is no evidence in the record that protected speech was a substantial or motivating factor behind his termination.[3] Rather, the record is full of uncontradicted facts showing that Defendant Prandini brought charges and the Board sustained those charges based on his use of profanity, insults and threats, his inappropriate touching of Paula Emmerth, and his untruthfulness during the investigation. *See* Findings and Decision of the Board, pp. 9-11; Prandini Dep. 87-88. In other words, the adverse employment action taken against Plaintiff was based on the aggressive and offensive manner in which he expressed himself, not the subject matter of his speech. As I will explain below, Defendants had

---

[3]The one possible exception to this is the Board's factual finding that Plaintiff acted "inappropriately" by accusing demonstrators of acting like the Taliban. (The Board's Findings and Decision, p. 7). Insofar as this statement was made while Plaintiff was off duty, I believe it was protected (so long as not made in a threatening manner) and should not have served as a motivating factor behind his termination. However, there is substantial evidence that the Taliban comment was in fact made in a threatening manner; and Defendants have provided more than adequate evidence to show that Plaintiff would have been terminated regardless of the Taliban comment.

11

a legitimate overriding interest in prohibiting their off-duty officers from speaking to members of the general public in such a manner.[4]

*Unprotected Speech*

The next category under which some of Plaintiff's speech falls is speech that loosely touched on matters of public concern but which Defendants had a legitimate overriding interest in proscribing. Although I think it a serious stretch, at this stage I am willing to accept Plaintiff's argument that when he called Emmerth a "fat fucking cow" he intended it as a pointed example of how the truth can hurt, as part of his broader argument that sometimes the starkest forms of truth–i.e. graphic images of aborted fetuses–must be softened to facilitate constructive discourse.[5] Therefore, in a very attenuated way, this comment could be said to touch on a matter of public concern.

However, I find that Defendants had a legitimate overriding interest in prohibiting their officers from using such profane and insulting language toward members of the public. Public

---

[4]Much of Plaintiff's briefing on whether the government may regulate offensive speech misses the mark entirely. He quotes lofty passages from leading First Amendment cases that do not deal with public employees, and seems to suggest that off-duty public employees are held to the same standard as the general public. That is incorrect. The *Pickering-Connick* line of cases demonstrate that when it comes to speech rights, public employees are never entirely off duty. Off-duty speech that is unrelated to the employee's work is still subject to *Pickering* balancing if the government can show that the speech is harmful to its purpose and mission. *San Diego v. Roe*, 543 U.S. at 81. The only public employee speech that receives the same vigorous First Amendment protection afforded to the general public is that which is unrelated to the employment *and* does not damage the mission and purpose of the government employer. *See generally United States v. Treasury Employees*, 513 U.S. 454 (1995) (*NTEU*).

[5]Of course, Plaintiff's assertion that calling Emmerth a "fat fucking cow" was part of an effort to inform is belied by his bizarre subsequent behavior of getting down on all fours to demonstrate aerobic exercises, and mocking Emmerth for hiding food somewhere. The much more plausible explanation is that Plaintiff was upset that Emmerth refused to take down the signs and was simply trying to belittle her.

trust in the police is critical to effective law enforcement and it is seriously eroded when police officers are perceived as abusing their authority or behaving unprofessionally. The public is far less likely to cooperate with law enforcement if they anticipate they will not be treated with respect–or worse, subject to verbal abuse. It is difficult to imagine more abusive language than calling someone a "fat fucking cow."

But this case raises much deeper concerns than unprofessional conduct. Plaintiff's expression did not just offend, it instilled fear–so much so that Wanda Glitz and Teresa Emmerth separately called the police for assistance. It is difficult to imagine anything more damaging to Defendants' legitimate interests (or basic social order) than a citizenry that fears its own police force. In this sense Plaintiff's off-duty conduct was far more damaging than the conduct at issue in cases like *San Diego v. Roe*, 543 U.S. 77 (2004) and *Dible v. City of Chandler*, 515 F.3d 918 (9th Cir. 2008). Plaintiff's behavior was not only embarrassing for the police department, it undermined public confidence that its officers could be trusted to act within the boundaries of the laws they are charged with enforcing.

Despite his protestations to the contrary, the record is replete with evidence of the damage Plaintiff's conduct caused to public perception. *See* Glitz Dep. 174 ("I was just processing this was a police officer out of control and what could have happened if it had not gone the way it did, and I got very upset."); Prandini Dep. 99-100 ("I measured [public perception] from the feedback I got back from people in the community, elected officials and whatnot that we have an officer with a serious problem here."); P. Emmerth Dep. 114 ("I was very intimidated, and [Plaintiff] calmed down his rage when I became submissive, and I felt trapped in his presence."); T. Emmerth Dep. 81 ("I was terrified and scared of [Plaintiff].") It is patently obvious that

13

public faith in the police force as a whole is undermined when members of the community fear one of its officers; Defendants need not put forth further evidence on this.

The record also contains evidence of the damage Plaintiff's conduct did to internal working relationships at the Des Plaines Police Department. Several officers were rightfully embarrassed by Plaintiff's conduct and Defendant Prandini gave credible testimony to show that Plaintiff's unprofessional conduct negatively impacted department morale. (Prandini Dep. 93-100). Defendants' interest in protecting working relationships in this case is at least as compelling as in *Connick*, and the speech at issue here is even less tied to matters of public concern. 461 U.S. at 151-52.

Given its attenuated connection to any issue of public concern, its profane and insulting nature, and Defendants' overwhelming legitimate interests in prohibiting such speech, I find that Plaintiff's repeated use of the phrase "fat fucking cow" is not protected under *Pickering-Connick* balancing and served as a legitimate basis for his discharge.

Finally, the biggest category in this case: speech and conduct unrelated to matters of public concern. Plaintiff's attempt to construe comments such as calling Wanda Glitz a "man hater" and a "psycho", or telling Paula Emmerth she would be a beautiful woman if she lost weight, as touching on matters of public concern is, frankly, absurd. In no way did these comments come close to relating to matters of "political, social, or other concern to the community." *Connick*, 461 U.S. at 138. They were insults and wildly inappropriate statements–nothing more.

Further, Defendants had adequate grounds to bring and sustain charges of assault and battery for Plaintiff's unwanted touching of Paula Emmerth and for untruthfulness during the investigation. Both of these form sufficient bases for dismissing Plaintiff. So even if he could

show that protected speech was a substantial or motivating factor in his discharge, he cannot prevail on Count I; Defendants have demonstrated that he still would have been terminated in the absence of protected speech. This is especially so in light of Plaintiff's considerable disciplinary history prior to May 20, 2006. I need not reach the issue of *Monell* liability because there is no constitutionally cognizable injury here. Defendants' motion for summary judgment on Count I is grated and Plaintiff's cross-motion is denied.

Count II, retaliation for protected union activity, is completely contrived. There is absolutely no evidence that Plaintiff's termination had anything to do with his union involvement and no reasonable jury could find otherwise. Defendants motion for summary judgment on Count II is granted.

B.      Counts III and IV: Facial Challenge to Department Rules

Plaintiff challenges City of Des Plaines Rules 310.02, 380.54, 310.34 and 390.50 under the First Amendment's overbreadth doctrine and any additional protections offered under Article 1 §§ 4 and 5 of the Illinois Constitution. The overbreadth doctrine allows a party to whom a rule or regulation may constitutionally be applied to challenge that rule or regulation on the grounds that it violates the First Amendment rights of others. *See New York v. Ferber*, 458 U.S. 747, 768 (1982). A rule or regulation's overbreadth must be substantial, in absolute terms and relative to its plainly legitimate sweep, before it offends the First Amendment. *U.S. v. Williams*, 553 U.S. 285, 292 (2008).

An overbreadth claimant bears the burden of demonstrating "from the text [of the rule or regulation] *and from actual fact*" that substantial overbreadth exists. *Virginia v. Hicks*, 539 U.S. 113, 122 (2003). Further, "there must be a *realistic danger* that the [rule or regulation] itself will significantly compromise recognized First Amendment protections of parties not before the

15

Court for it to be facially challenged on overbreadth grounds." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 901 (1984).

Plaintiff does not even attempt to carry his burden of demonstrating from actual fact that substantial overbreadth exists. He does not mention Counts III and IV in his response briefing and there are no facts in the record suggesting a realistic danger that the City of Des Plaines has enforced the challenged rules in a way that chills its employees' protected speech. The text of the rules appear perfectly in line with *Pickering-Connick* balancing. Indeed, virtually every municipality in the country has similarly worded rules and regulations for its employees and the Supreme Court has never so much as hinted at facial invalidity absent a specific factual showing of overly broad application. I decline to spend any more time analyzing a claim the Plaintiff himself appears to have abandoned.

Plaintiff has not provided, and this court is unable to find, any law suggesting that Article I §§ 4 and 5 of the Illinois Constitution offer any greater protection in the overbreadth realm than the federal constitution.

Defendants' motion for summary judgment on Counts III and IV is granted.

C.      Count V: Judicial Review of Administrative Decision to Terminate

Count V seeks administrative review of the Board's decision to sustain charges and terminate Plaintiff under the Illinois Administrative Review Act, 735 ILCS 5/3-101. As the court of review, I must rely on the record compiled in the administrative proceeding and look only to determine whether the agency's legal conclusions are correct and the agency's factual conclusions are supported by substantial evidence. *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 926 (7th Cir. 2000).

16

First, I find that the Board's legal conclusions are, for the most part, correct, and any errors were harmless and did not impact the outcome of the proceedings. Given that this is a public employee speech case, the Board should have analyzed Plaintiff's speech under the *Pickering-Connick* line of cases, not as generally unprotected "fighting words." *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942). This would have forced the board to more clearly articulate its own legitimate interests in prohibiting its officers from engaging in the type of off-duty conduct that Plaintiff engaged in. Here, although the Board did not expressly lay out its interests, the record contains adequate facts to support Defendants' position.

Second, I find that there is substantial evidence in the record for all of the Board's factual findings. Plaintiff admits many of the most serious allegations, and the ones over which there is a factual dispute the Board made credibility determinations that are well supported and which I am in a poor position to second guess.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted and Plaintiff's motion for partial summary judgment is denied.

ENTER:

James B. Zagel
United States District Judge

DATE: October 18, 2012